**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **PET-AG, INC.**, | |
| Plaintiff, | |
| v. | Case No. 22-cv-663 |
| | Judge _____ |
| **CDI DISTRIBUTION INC.**; and **JOHN DOES 1-10**, | Magistrate Judge _____ |
| Defendants. | Jury Trial Demanded |

**COMPLAINT FOR DAMAGES, INJUNCTIVE, AND OTHER RELIEF FOR
VIOLATION OF 15 U.S.C §§ 1114, 1125(A), AND RELATED STATE CLAIMS**

Plaintiff Pet-Ag, Inc., a Delaware corporation ("Plaintiff" or "Pet-Ag"), brings this action against Defendant CDI Distribution, Inc. ("CDI") and John Does 1-10 (collectively, "Defendants") for trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114; unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a); violation of the Illinois Uniform Deceptive Trade Practices Act; common law trademark infringement, tortious interference with existing/prospective contract and business relationships, and alleges as follows. These claims arise from Defendants' misappropriation of Pet-Ag's trademarks in conjunction with their unlawful and unauthorized sale of materially different products bearing Pet-Ag's trademarks on the Internet.

**PARTIES, JURISDICTION, AND VENUE**

1.      Plaintiff Pet-Ag is a Delaware corporation with its principal place of business in Hampshire, Illinois.

2.      Defendant CDI is a New Jersey corporation with its principal place of business in Linden, New Jersey.

3.      Upon information and belief, CDI operates a third-party storefront on www.amazon.com ("Amazon") that is currently called "Luving Pets 'N' More" with Merchant ID A88IEG9CXEJBC ("Luving Pets Storefront").

4.      The true names, involvement, and capacities, whether individual, corporate, associated, or otherwise, of Defendants John Does 1 through 10 ("Doe Defendants") are unknown to Pet-Ag.  Therefore, Pet-Ag sues these Defendants by a fictitious name.  Pet-Ag is informed and believes, and on that basis alleges, that the Doe Defendants include persons and entities assisting or acting in connection with the actions complained of herein and include persons and entities that are responsible in some manner for the acts, occurrences and liability hereinafter alleged and referenced.  For example, the Doe Defendants unlawfully acquired, distributed, or sold products bearing Pet-Ag's trademarks to CDI, or otherwise assisted in the operation of the Luving Pets Storefront.  When the true names, involvement, and capacities of these parties are ascertained, Pet-Ag will seek leave to amend this Complaint accordingly.

## JURISDICTION AND VENUE

5.      This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1338, and 1367.  Plaintiff's federal claims are predicated on 15 U.S.C. §§ 1114, 1125(a) and (c), and its claims arising under the laws of the State of Illinois are substantially related to its federal claims such that they form part of the same case or controversy under Article III of the United States Constitution.

6.      This Court has personal jurisdiction over Defendants because they have expressly aimed tortious activities toward the State of Illinois and established sufficient minimum contacts with Illinois by, among other things, advertising and selling infringing products bearing Pet-Ag's trademarks to consumers within Illinois through a highly interactive commercial website, through

the regular course of business, with the knowledge that Pet-Ag is located in Illinois and is harmed in Illinois as a result of Defendants' sales of infringing products to Illinois residents. Defendants know that Pet-Ag is located in Illinois, among other reasons, because they received a cease-and-desist letter informing them that Pet-Ag is located in Illinois and is harmed in Illinois by their unlawful actions. Pet-Ag's claims arise out of Defendants' sales of infringing products bearing Pet-Ag's trademarks to Illinois residents through the regular course of business.

7.     Defendants continue to engage in these actions despite being put on notice of their illegal conduct and the impendency of this action.

8.     Venue is properly found in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims herein occurred within this judicial district.

## FACTUAL ALLEGATIONS

### Pet-Ag & Its Trademarks

9.     Pet-Ag manufactures and distributes pet and animal feeding and health products.

10.     Pet-Ag was originally founded as a division of Borden, Inc. Pet-Ag's first product—a milk replacement powder named Esbilac®–became the world's first commercially prepared, nutritionally balanced formula for puppies.

11.     Pet-Ag not only provides products for dogs and cats, but it also makes key feeding and health products for many other species, including: Foal-Lac® for equines; Bene-Bac® Plus for birds and reptiles, and their Zoologic® line of formulas for wildlife and exotic animals.

12.     Pet-Ag's products are used in the care and feeding of pets and exotic animals all over the world.

13.     Pet-Ag's products are available exclusively at national pet chains and independent retailers who are expressly authorized by Pet-Ag to sell in their brick-and-mortar locations and on the Internet.

14.     Pet-Ag devotes a significant amount of time, energy, and resources toward protecting the value of its brand, products, name, and reputation.

15.     On the consumer side, Pet-Ag offers its customers general and product-specific care instructions, including on intended use and storage.

16.     On the distribution side, Pet-Ag's quality control consists of ensuring that its products are distributed only through Pet-Ag itself or through Pet-Ag Authorized Sellers, who must follow Pet-Ag's quality controls and are accountable to Pet-Ag for any quality issues.  By distributing products exclusively in this manner, Pet-Ag is better able to control the quality and integrity of its products and ensure that customers receive accurate information about them.

17.     To promote and protect the Pet-Ag brand, has registered numerous trademarks with the United States Patent and Trademark Office for its brand and products or acquired rights to trademarks, including the following (collectively, the "Pet-Ag Registered Trademarks"):

  a.   Bene-Bac® (U.S. Trademark Reg. No. 3075370);

  b.   Bospro® (U.S. Trademark Reg. No. 0948025);

  c.   Boundary® (U.S. Trademark Reg. No. 1019191);

  d.   Cat-Sip® (U.S. Trademark Reg. No. 1788940);

  e.   DYNE® (U.S. Trademark Reg. No. 1769634);

  f.   EMT® (U.S. Trademark Reg. No. 3201047);

  g.   Esbilac® (U.S. Trademark Reg. No. 0439707);

  h.   Fawn-Lac® (U.S. Trademark Reg. No. 5763928);

4

i.    Fermacto® (U.S. Trademark Reg. No. 0643350);

j.    Foal-Lac® (U.S. Trademark Reg. No. 1043942);

k.    Fresh n' Clean® (U.S. Trademark Reg. Nos. 1635271, 1433494, 1638093, 1644222, 2984276);

l.    GME® (U.S. Trademark Reg. No. 2013508);

m.    KMR® (U.S. Trademark Reg. No. 0961028);

n.    Linatone® (U.S. Trademark Reg. No. 0823586);

o.    Mirra Coat® (U.S. Trademark Reg. No. 0768257);

p.    Multi-Milk® (U.S. Trademark Reg. No. 3057034);

q.    Pet-Ag® (U.S. Trademark Reg. No. 73683523);

r.    PetAg® (U.S. Trademark Reg. No. 1831054);

s.    PetLac® (U.S. Trademark Reg. No. 2608762);

t.    PET Pectillin® (U.S. Trademark Reg. No. 0980872);

u.    Prozyme® (U.S. Trademark Reg. No. 2318171);

v.    Shed Relief® (U.S. Trademark Reg. No. 3162728);

w.    Trophy® (U.S. Trademark Reg. No. 1701351); and

x.    Zoologic® (U.S. Trademark Reg. No. 1843830).

18.    The registration for each of the Pet-Ag Registered Trademarks is valid, subsisting, and in full force and effect.

19.    Pet-Ag actively uses and markets the Pet-Ag Registered Trademarks in commerce.

20.    Consumers recognize the Pet-Ag Registered Trademarks as being associated with Pet-Ag products.

21.     Due to the quality and exclusive distribution of Pet-Ag's products, and because Pet-Ag is recognized as the source of high-quality products, the Pet-Ag Registered Trademarks have enormous value.

**Online Marketplaces and the Challenge They Present to Pet-Ag Product Quality**

22.     E-commerce retail sales have exploded over the past decade.  From Q3 2011 to Q3 2021, the percentage of total retail sales in the United States that were completed through e-commerce channels rose from 4.9% to 13%.  *See* Federal Reserve Bank of St. Louis, *E-Commerce Retail Sales as a Percent of Total Sales* (November 18, 2021), https://fred.stlouisfed.org/series/ECOMPCTSA.

23.     While online marketplaces have created a great deal of opportunity, they also greatly challenge a brand owner's ability to control the quality and safety of its products.

24.     Unlike when purchasing products at a brick-and-mortar store, consumers who purchase products through online marketplaces cannot touch, inspect, or interact with products before purchasing them.  Instead, consumers must trust that the product they receive from an online order will be authentic and of the quality they expect and typically receive from the manufacturer.

25.     Online marketplaces have an exceedingly low barrier to entry, do not require sellers to be authorized sellers of the products they sell, and do not require sellers to disclose to consumers whether they are an authorized or unauthorized seller.  As a result, any person who is able to obtain a brand owner's products through unauthorized diversion can sell the products on online marketplaces while concealing that they are an unauthorized seller who is outside of, and does not abide by, the brand owner's quality controls.

26.     Online marketplaces are overrun by unauthorized sellers who have no relationship with (or obligations to) brand owners who exercise quality controls over their products sold by

authorized sellers. It is unfortunately common for unauthorized sellers to sell diverted products on online marketplaces that are of lesser quality than products sold through brand owners' authorized channels. *See* Scott Cohn, *Greed Report: Your quest for savings could land you in the "gray market,"* CNBC, Sept. 8, 2016, https://www.cnbc.com/2016/09/08/greed-report-your-quest-for-savings-could-land-you-in-the-gray-market.html; Alexandra Berzon et al., *Amazon Has Ceded Control of Its Site. The Result: Thousands of Banned, Unsafe or Mislabeled Products*, THE WALL STREET JOURNAL, Aug. 23, 2019, https://www.wsj.com/articles/amazon-has-ceded-control-of-its-site-the-result-thousands-of-banned-unsafe-or-mislabeled-products-11566564990. It is also common for unauthorized sellers to sell products that are previously used—including products retrieved from dumpsters—as "new" on online marketplaces. *See* Khadeeja Safdar et al., *You Might Be Buying Trash on Amazon—Literally*, THE WALL STREET JOURNAL, Dec. 18, 2019, https://www.wsj.com/articles/you-might-be-buying-trash-on-amazonliterally-11576599910.

27. Third-party sellers on Amazon may also sell counterfeit items or allow counterfeit items to enter the stream of commerce through poor controls, sourcing, and fulfillment practices.

28. For example, the Department of Homeland Security recently published a report noting that online marketplaces can facilitate the sale of counterfeit goods and that "American consumers shopping on e-commerce platforms and online third-party marketplaces now face a significant risk of purchasing counterfeit or pirated goods." Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods* (Jan. 24, 2020), available at https://www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-goods-report_01.pdf, at 7. The report stated that consumers on online marketplaces cannot rely on traditional "red flag" indicators of counterfeits and "have been surprised to discover that upon completion of an online sales transaction, that the order will be fulfilled by an unknown third-party

seller." *Id*. at 14-15, 38. To mitigate these problems, the report recommended "[s]ignificantly enhanced vetting of third-party sellers." *Id.* at 35.

29.     The business press has also reported extensively on how there is an "epidemic" of counterfeit products being sold on the online marketplaces that diverters are exploiting because they know consumers trust marketplaces and think the products they are buying through the marketplaces are genuine. *See* Spencer Soper, *Amazon Gets Real About Fakes*, Bloomberg, Nov. 28, 2016, https://www.bloomberg.com/news/articles/2016-11-28/amazon-gets-real-about-fakes; Jay Greene, *How Amazon's quest for more, cheaper products has resulted in a flea markets of fakes*, THE WASHINGTON POST, Nov. 14, 2019, https://www.washingtonpost.com/technology/2019/11/14/how-amazons-quest-more-cheaper-products-has-resulted-flea-market-fakes/?arc404=true.

30.     The problem of sales of counterfeit and other poor-quality products on online marketplaces has become so serious that, in November 2019, the United States Senate Finance Committee issued a bipartisan report on the issue. The Committee found that the rise of e-commerce has fundamentally changed how consumers shop for products and that, as e-commerce has grown, counterfeit goods and products that "violate a right holder's trademark or copyright" are being sold at an accelerating rate on e-commerce platforms. The Committee concluded that these sales are a "significant threat" to rights holders' brands and to consumers, and that under current law it is up to rights holders to protect their intellectual property rights online. *See* Senate Finance Committee, *The Fight Against Fakes: How Statutory and Regulatory Barriers Prevent the Sharing of Information on Counterfeits*, Nov. 7, 2019, https://www.finance.senate.gov/imo/media/doc/The%20Fight%20Against%20Fakes%20%20(2019-11-07).pdf.

31.     In its 2018 and 2019 annual reports to its shareholders, Amazon also admitted that third party sellers on its marketplace are selling products that are "counterfeit," "pirated," "stolen," or otherwise "materially different" from the product that was described to consumers. *See* Amazon.com, Inc., Annual Report (Form 10-K), at 14 (Jan. 31, 2019), *available at* https://www.sec.gov/Archives/edgar/data/1018724/000101872419000004/amzn-20181231x 10k.htm; Amazon.com, Inc., Annual Report (Form 10-K), at 14-15 (January 30, 2020), *available at* https://ir.aboutamazon.com/static-files/63a014ac-bd47-42ce-b548-022a90d96e9a. Amazon conceded that these actions are "violating the proprietary rights of others," and warned its investors that it could be liable for "unlawful activities" of Amazon third-party sellers.

32.     Because brand owners have no relationship with or control over unauthorized sellers, brand owners have no ability to exercise their quality controls over products sold by unauthorized sellers or to ensure the products are safe and authentic. A manufacturer's inability to exercise control over the quality of its products presents serious risks to the safety of consumers.

33.     The structure, construction, and user interface of online marketplaces also pose threats to a manufacturer's ability to maintain its goodwill, reputation, and brand integrity.

34.     When purchasing products on an online marketplace, customers are not informed whether a seller of a product is authorized by the manufacturer. Additionally, the interface design of many online marketplaces causes consumers to falsely believe that they are always purchasing from the manufacturer or, at minimum, from an authorized seller that is selling under the manufacturer's oversight and with the manufacturer's approval. Consumers who purchase on Amazon are particularly likely to experience this confusion because, on Amazon, all sellers of a product are listed under a single product listing that states "By [name of brand]" immediately under

the title of the product even though many products are sold on Amazon by unauthorized sellers that have no relationship with the brand owner.

35.     For all of these reasons, a vast number of consumers purchase products on online marketplaces without recognizing that they purchased from an unauthorized seller that does not (and cannot) follow the manufacturer's quality controls.

36.     When a customer purchases a product on an online marketplace and receives a damaged, defective, or otherwise poor-quality product, the customer is much more likely to associate the problem with the brand/manufacturer rather than the product seller.

37.     Online marketplaces also give disgruntled customers a powerful and convenient forum to air their grievances about problem products—online product reviews.  Any consumer who is dissatisfied with the product received can post a review on the marketplace for all other consumers across the world to see.  These reviews, which are often permanently fixed, will often criticize the brand rather than the marketplace seller that sold the product.

38.     Online product reviews significantly impact a brand's reputation.  Survey results show that 82% of United States adults "sometimes" consult online reviews for information when they consider buying a new product online, and 40% "always" or "almost always" consult such reviews.  Aaron Smith & Monica Anderson, *Online reviews*, PEW RESEARCH CENTER, Dec. 19, 2016, http://www.pewinternet.org/2016/12/19/online-reviews/.

39.     Consumers place extraordinary trust in these online reviews.  Indeed, consumers are more than 10 times more likely to rely on consumer-generated product reviews than product descriptions written by manufacturers.  *Moms Place Trust in Other Consumers*, EMARKETER, Feb. 10, 2010, https://www.emarketer.com/Article/Moms-Place-Trust-Other-Consumers/1007509.

40. Because consumers so heavily "rely on reviews when they're shopping online," the Federal Trade Commission has begun suing companies who post fake reviews of their products on online marketplaces. Megan Henney, *FTC cracking down on fake Amazon reviews*, FOX BUSINESS, Feb. 28, 2019, https://www.foxbusiness.com/technology/ftc-cracking-down-on-fake-amazon-reviews (quoting a press release from the director of the FTC).

41. Reviews are especially impactful on online consumers. In a brick-and-mortar store, a consumer can simply select another product from the shelf if the initial product selected appears to be compromised. However, online consumers are left simply having to hope that the product that shows up on their doorstep is of appropriate quality. Therefore, online consumers rely more on brand reputation and reviews.

42. Because of the reliance consumers place on online reviews, negative online reviews can be the death knell for a manufacturer's online product listings. According to one study, merely three negative online reviews will deter a majority (67%) of online consumers from purchasing a particular product. Graham Charlton, *How many bad reviews does it take to deter shoppers?*, ECONSULTANCY, April 11, 2011, https://econsultancy.com/blog/7403-how-many-bad-reviews-does-it-take-to-deter-shoppers.

43. Negative reviews also hurt a brand's placement in search results on Amazon and other search engines, as Amazon's search algorithm downgrades products it believes consumers are less likely to buy. Thus, poor reviews can create a downward spiral where downgraded search placement leads to reduced sales, which leads to search placement falling further.

11

**Pet-Ag Has Been the Target of Negative Online Marketplace Reviews from Customers Who Purchased Products from Unauthorized Sellers**

44.     Pet-Ag has been a victim of the issues caused by unauthorized sellers on online marketplaces.   Indeed, Pet-Ag has received many negative online marketplace reviews from customers who likely purchased products from unauthorized sellers, such as Defendants.

45.     Defendants sell many products on Pet-Ag-branded Amazon listings that have received negative reviews.  Product reviews on Amazon cannot be traced back to a specific seller, so consumers who view these reviews may attribute them to Pet-Ag rather than Defendants.

46.     For example, Defendants are currently offering products for sale on the product listing for "PetAg Esbilac Powder Milk Replacer" seen below:




47.     Customers buying from this listing have left reviews complaining of receiving damaged products, such as in the following examples:

⭐☆☆☆☆ **Arrived half empty**
Reviewed in the United States on August 1, 2020
Size: 1.75 Pound (Pack of 1) | Verified Purchase

Product arrived half spilled with no lid and container popped in half



⭐☆☆☆☆ **Damage**
Reviewed in the United States on July 22, 2019
Size: 12 Ounce (Pack of 1) | Verified Purchase

Came damage in the box.



⭐⭐⭐☆☆ **Damaged product**
Reviewed in the United States on April 14, 2020
Size: 12 Ounce (Pack of 1) | Verified Purchase

This is a great product, good price and good shipping speed...BUT can came significantly dented making seal of lid (once opened) a solid no go. Yes retry disappointed as the shipping box wasn't damaged, so I guess they felt it was ok to ship a damaged can 😕

⭐☆☆☆☆ **Won't even get to use it.**
Reviewed in the United States on March 19, 2019
Size: 12 Ounce (Pack of 1) | Verified Purchase

For some reason they shipped it with a bag of cat food and a kitchen faucet. And it ripped the cat food open, and exploded all over everything. I appreciate the big mess it made.



48.     Another customer complained about receiving an item that was a different color and texture from the item she had previously received at the veterinarian and that the item from Amazon sickened her pet:

⭐☆☆☆☆ **Made puppies sick**
Reviewed in the United States on October 28, 2019
Size: 12 Ounce (Pack of 1) | Verified Purchase

If I could give zero stars I would. I don't know what has changed with this formula but the cans I got from Amazon made my puppies sick with diarrhea, vomiting, bloating and pain.
The powder was a different color then the can I got at the vets and it was grainier too.
I'll never buy the brand again. Do yourself a favor and buy a better replacer for your pups.
I returned my order.

49.     Still another customer complained about receiving an item that was moist and clumpy, different from the items she had purchased from a pet store:

⭐⭐☆☆☆ **Okay price...arrived damp and clumpy**

Reviewed in the United States on August 6, 2019

Size: 12 Ounce (Pack of 1)   |   Verified Purchase

I have purchased this formula for my puppy at the pet store before and it was different from what I received from Amazon. This arrived sealed but the powder is moist and clumpy. (Not normal)

50.    Defendants are also selling products on the following product listing for "PetAg Bene-Bac Plus Pet Powder with FOS and Probiotics":



51.    Customers buying from this product listing have also complained of receiving damaged products:

⭐⭐⭐☆☆ **Smushed, but good quality**

Reviewed in the United States on June 27, 2021

Verified Purchase

Came completely smushed with almost half the powder lost into the bag that surrounded it. Otherwise, cat seems pleased enough with it and it's a good, reasonably priced way to get him some extra nutrients

52.    Other customers buying from this product listing have complained of receiving products that were expired or nearly expired:

⭐☆☆☆☆ **Dated to expire within 3 months time!**

Reviewed in the United States on March 16, 2019

Verified Purchase

It was written as to be expired within 3 months time. That's just ridiculous... Id you purchase this make sure to read the reputation date! I returned mine.

14

⭐☆☆☆☆ **Be careful expire date!!!!**
Reviewed in the United States on September 12, 2018
**Verified Purchase**

Just order your product (bene bac plus 1 pound)for 6 pieces on Feb 2018 they all expire on October 2018. Now I still got 4 pieces left but they all expired. That's not good.

⭐☆☆☆☆ **One Star**
Reviewed in the United States on May 22, 2018
**Verified Purchase**

This product was expired in Feb 2018. Delivered May 2018. WTF? This will be going back.

53.     Upon information and belief, the foregoing complaints were made by consumers who purchased products from unauthorized sellers, such as Defendants, who sell products on the above Pet-Ag product listings without complying with Pet-Ag's quality controls.

**Pet-Ag Has Implemented Quality Controls Throughout Its Authorized Channels of Distribution to Combat the Problems Presented By Online Marketplaces and Ensure Customers Receive the Genuine, High Quality Products They Expect From Pet-Ag**

54.     The above reviews show how sales of poor-quality Pet-Ag products disappoint Pet-Ag's consumers and cause significant harm to the reputation and goodwill of Pet-Ag and its brands. To protect itself and consumers from these harms, Pet-Ag implemented a quality control program that applies to all of its Authorized Sellers, including sellers that sell in a brick-and-mortar retail setting and sellers that sell online.

55.     Pet-Ag's distribution controls are a quality control measure intended to minimize the risk and reputational damage caused by the illegal sale of poor-quality products bearing the Pet-Ag Registered Trademarks by unauthorized sellers like Defendants who do not abide by Pet-Ag's quality controls.  The goal of Pet-Ag's quality control program is to ensure that consumers who buy Pet-Ag products, including ones buying online, receive the high-quality products and services that they expect with the Pet-Ag name.  By preventing consumers from receiving poor-quality products, the program both protects consumers from confusion and protects the value and goodwill associated with the Pet-Ag brand.

15

56.     Pet-Ag abides by its quality control requirements and requires its Authorized Resellers, Authorized Retailers, and Authorized Distributors (collectively, "Authorized Sellers") to abide by them as well.

57.     Pet-Ag's ability to exercise its quality controls is essential to the integrity and quality of Pet-Ag products, as well as the value of the Pet-Ag Registered Trademarks and other intellectual property.

58.     Pet-Ag's quality controls begin with requiring that all outside sales of its products take place through Pet-Ag's through Authorized Sellers.  This basic step ensures that everyone who is selling Pet-Ag products is ultimately subject to Pet-Ag's quality control requirements.

59.     Pet-Ag carefully vets prospective Authorized Sellers to ensure that only those applicants with a reputation for and a commitment to quality are permitted to become Authorized Sellers of Pet-Ag products.

60.     Authorized Sellers are required by contract to sell products only in certain channels and to abide by the policies applicable to the Seller under the Pet-Ag, Inc. Authorized Reseller Program (collectively, the "Pet-Ag Terms").

61.     Among other conditions, the Pet-Ag Terms require Authorized Sellers to purchase Pet-Ag products and services only from Pet-Ag directly or Authorized Distributors, per the applicable policy.  This restriction ensures that the chain of custody can be established for all Pet-Ag products sold to consumers by Authorized Sellers, and thus prevents unsafe or unsanitary products, secondhand goods, or other low-quality products from entering into the distribution chain.  On the flip side, the Pet-Ag Terms also require Authorized Sellers to sell only to end users (and not resellers), thus preventing leaks in the chain of distribution.

16

62. These restrictions are essential to Pet-Ag's ability to exercise its quality controls over Pet-Ag products because they prevent unauthorized sellers from obtaining and reselling Pet-Ag Products and allow Pet-Ag to know where all of its products are being sold online by Authorized Sellers. If a quality issue arises through an online sale, Pet-Ag can identify the Authorized Seller that made the sale, contact the Authorized Seller, and address the issue immediately. Pet-Ag is unable to take such action against unauthorized sellers because it does not know who those sellers are and cannot obtain their cooperation in addressing any product quality issues that may arise.

63. Authorized Sellers are also prohibited from selling Pet-Ag products on any website unless they first obtain written consent from Pet-Ag.

64. In addition to restricting where and how Authorized Sellers can sell Pet-Ag Products, the Pet-Ag Terms also require Authorized Sellers to follow numerous quality control requirements related to the inspection, handling, and storage of Pet-Ag products.

65. To ensure that customers receive the genuine and high quality products they expect from Pet-Ag, the Pet-Ag Terms require Authorized Sellers to inspect all Pet-Ag products for any damage, defects, evidence of tampering, and other non-conformance, and remove all such products from inventory. Authorized Sellers are prohibited from selling damaged or defective products. Further, to assist Pet-Ag in identifying any product quality issues, Authorized Sellers are required to report any defects to Pet-Ag.

66. The Pet-Ag Terms also require that Authorized Sellers store Pet-Ag products in accordance with guidelines issued by Pet-Ag. This requirement helps ensure that Pet-Ag products are stored properly and are not damaged prior to being shipped to the consumer.

17

67.     To avoid consumer confusion and ensure that customers receive genuine Pet-Ag products, the Pet-Ag Terms prohibit Authorized Sellers from altering any Pet-Ag products or packaging without Pet-Ag's consent, or selling Pet-Ag products outside of approved Pet-Ag-branded packaging.

68.     Authorized Sellers are also prohibited from tampering with, defacing, or otherwise altering any identifying information on Pet-Ag products, including any serial number, UPC code, or other identifying information.

69.     Authorized Sellers must also manage product inventory on a "first-in, first-out" (FIFO) basis, with older inventory being sold before newer inventory of the same product. This prevents customers from receiving expired or close-to expired product, which is important for safety of consumption by pets and other animals.

70.     The Pet-Ag Terms gives Pet-Ag the right to monitor and audit Authorized Sellers by inspecting their facilities and records relating to Pet-Ag Products, to ensure their compliance with Pet-Ag's quality control requirements. Authorized Sellers also must cooperate with Pet-Ag with respect to any product recall or other consumer safety information dissemination effort conducted by Pet-Ag regarding Pet-Ag products.

71.     The Pet-Ag Terms also require Authorized Sellers to provide various customer services to their customers.

72.     Pet-Ag's quality control and customer service requirements are legitimate and substantial and have been implemented so that Pet-Ag can control the quality of goods manufactured and sold under the Pet-Ag Trademarks, to protect consumers as well as the value and goodwill associated with the Pet-Ag Trademarks.

73.     Pet-Ag's quality control and customer service requirements are also material, as they are designed to protect consumers and prevent them from receiving poor quality and unsafe products. Consumers would find it material and relevant to their purchasing decision to know whether a Pet-Ag product that they were considering buying was being sold by an Authorized Seller who is subject to Pet-Ag's quality control and customer service requirements or whether the product is being sold by an unauthorized seller who is not subject to, and does not abide by, Pet-Ag's quality controls and over whom Pet-Ag is unable to exercise its quality controls.

### Given the Flood of Poor Quality Products Being Sold Online and Consumers' Inability to Inspect Such Products Before Purchase, Pet-Ag Imposes Additional Requirements on Its Authorized Sellers Who Sell Online

74.     As shown in consumer reviews cited above, Pet-Ag products sold online are more susceptible to quality and authenticity problems, as consumers cannot see the product before they buy it. These problems are especially severe on online marketplaces such as Amazon, where sellers can conceal the fact that they are an unauthorized seller, and many sellers may share a single product listing page.

75.     Given these heightened risks to consumer satisfaction and the value of its trademarks that are posed by online sellers, Pet-Ag imposes additional quality control requirements on all of its Authorized Sellers who sell Pet-Ag products online.

76.     Initially, all of Pet-Ag's Authorized Sellers are required to obtain Pet-Ag's approval to sell online. Pet-Ag will only approve a website where it is clear that the website is operated by the Authorized Seller in its own name, thus preventing sales by anonymous online sellers who are not accountable to consumers or Pet-Ag and making sure that consumers always know who they are buying from, the way they would know what store they are buying from when shopping brick-and-mortar. Prior to approving a website, Pet-Ag will also check to ensure that all descriptions of

Pet-Ag products and services on the website are accurate so that consumers know exactly what they are buying.

77.     Because of the unique nature of the Amazon marketplace, Pet-Ag has only named one authorized seller on Amazon, and that authorized seller is subject to even more heightened quality controls in addition to the quality controls that apply to all other Authorized Sellers.

78.     Among these quality controls, Pet-Ag's authorized Amazon seller is prohibited from selling anonymously and is required to use reasonable efforts to respond to all consumer feedback and provide copies of the consumer feedback and related material to Pet-Ag upon request.  These requirements allow the consumer to identify the seller and know who to contact to address issues, as well as allowing Pet-Ag to quickly identify and address any quality issues that consumers encounter.

79.     Pet-Ag's authorized Amazon seller is also required to provide monthly reports of performance data collected by Amazon, such as order defect rates and customer dissatisfaction rates.  This data is a quantitative measure of a seller's quality and is collected by Amazon for all sellers, but not made publicly available.  By requiring its authorized seller to provide this data, Pet-Ag is able to ensure that the seller remains high-quality.

80.     Pet-Ag's authorized Amazon seller must not allow Amazon to commingle its inventory with other sellers.  Amazon sellers may use Amazon to fulfill orders for their products. If they do so, by default, Amazon will commingle their products with those of other sellers on the same product listing (which makes it easier for Amazon to manage its logistics).  As the United States Senate Finance Committee recently recognized (*see supra* ¶ 30), the practice of commingling increases the risk that consumers will receive counterfeits because counterfeit inventory can be commingled with other inventory.  Amazon sellers must affirmatively opt-out of

commingling and take the extra step of applying special stickers to prevent commingling. Pet-Ag's authorized Amazon seller is required to take this step, but Pet-Ag has no way of knowing if unauthorized Amazon sellers are taking this step.

81.     The additional quality control requirements that Pet-Ag imposes on its authorized online sellers and authorized Amazon seller are legitimate and substantial, and they have been implemented to allow Pet-Ag to carefully control the quality of Pet-Ag products that are sold online and quickly address any quality issues that arise.

82.     Pet-Ag's additional quality controls are also material, as they have been implemented to ensure that consumers purchasing Pet-Ag products online and on Amazon receive genuine, high-quality Pet-Ag products that abide by Pet-Ag's quality controls. Consumers purchasing Pet-Ag products online and on Amazon would find it relevant to their purchasing decision to know whether the product they are buying is vended by an authorized online seller who is subject to, and abides by, Pet-Ag's quality controls.

### Pet-Ag Monitors and Audits Its Authorized Online Sellers To Ensure They Comply With Its Quality Control Requirements

83.     Pet-Ag regularly audits its authorized websites to ensure that Authorized Online Sellers are adhering to Pet-Ag's quality control requirements. Pet-Ag carries out its auditing and monitoring actions pursuant to an internal program called the Pet-Ag Online Quality Control Program ("Auditing Program").

84.     As part of its Auditing Program, Pet-Ag examines a rotating sample of authorized websites on a regular basis to ensure that the Authorized Online Sellers who sell through the websites are complying with the Pet-Ag Terms. During these examinations, Pet-Ag checks to make sure that, among other requirements, the websites: (i) clearly state an Authorized Online Seller's legal name or registered fictitious business name and provide contact information for the

21

Authorized Online Seller; (ii) do not give the appearance that they are operated by Pet-Ag or a third party; (iii) do not display any content that could be detrimental to the Pet-Ag family of brands; (iv) do not make any representations regarding Pet-Ag products that are misleading; (v) exclusively contain images of Pet-Ag products and product descriptions that are supplied or authorized by Pet-Ag and up-to-date; and (vi) have a mechanism through which customers can provide feedback.

85.     Pet-Ag also periodically inspects online reviews of Pet-Ag products and Authorized Online Sellers that appear on authorized websites.  If Pet-Ag discovers reviews asserting that Authorized Online Sellers provided poor customer service, sold poor-quality Pet-Ag products, or otherwise did not adhere to the quality control and customer service requirements that all Authorized Sellers are required to follow, Pet-Ag communicates with the responsible Authorized Online Sellers to determine the cause(s) of the negative reviews, take any necessary corrective action, and secure the removal of negative reviews if possible.

86.     Pet-Ag also periodically conducts a test purchase of a Pet-Ag product from a rotating sample of authorized websites.  If Pet-Ag discovers any quality problems in purchased products or discovers that an Authorized Online Seller is otherwise not following the quality control requirements that Authorized Online Sellers must follow when selling on authorized websites—for example, by altering product packaging or fulfilling product orders through an unapproved third-party fulfillment service—Pet-Ag communicates with the responsible Authorized Online Seller and takes any necessary corrective action.

87.     These quality controls are essential for the Pet-Ag Registered Trademarks because they minimize the risk that consumers purchasing Pet-Ag products on Amazon will receive poor-quality products, and allow Pet-Ag to quickly address any quality issues that do arise.

22

**Genuine Pet-Ag Products Come with Pet-Ag's 60-Day Satisfaction Guarantee; Defendants' Products Do Not**

88.     Pet-Ag also provides customers who purchase genuine Pet-Ag products from Authorized Resellers with the "Pet-Ag Product Promise," which is a 60-day satisfaction guarantee ("Pet-Ag Satisfaction Guarantee").

89.     The Pet-Ag Satisfaction Guarantee offers a replacement product or full refund of the purchase price of a Pet-Ag product within 60 days of the original purchase date when a customer is dissatisfied with the product for any reason. *See Official Pet-Ag Product Promise, available at* https://www.petag.com/product-promise. Such statements are incorporated herein.

90.     As discussed above, Pet-Ag cannot ensure the quality of the products sold by unauthorized sellers, like Defendants, who are not subject to Pet-Ag's quality controls. For this reason, the Pet-Ag Satisfaction Guarantee does not cover Pet-Ag products sold by unauthorized sellers, like Defendants, who do not comply with Pet-Ag's quality controls and standards. Indeed, the Pet-Ag Satisfaction Guarantee specifically states: "not available for products purchased from unauthorized sellers, including unauthorized Internet websites and unauthorized storefronts on online marketplace websites."

91.     The Pet-Ag Satisfaction Guarantee is a material component of genuine Pet-Ag products. Consumers who purchase Pet-Ag products with the Pet-Ag Satisfaction Guarantee receive the peace of mind that they are receiving a good quality product, that Pet-Ag stands behind the product, and that if they are not satisfied, they can get a refund or replacement.

92.     Consumers would find it material and relevant to their purchasing decision to know whether a Pet-Ag product they were considering buying was covered by the Pet-Ag Satisfaction Guarantee. If a consumer knew a product did not come with the Pet-Ag Satisfaction Guarantee, the consumer would be less likely to purchase the product.

23

**Defendants Are Not Authorized Sellers and Are Illegally Selling Non-Genuine Products Bearing the Pet-Ag Trademarks**

93.     Due to the risks to consumers and the reputational concerns associated with the illegal sale of products bearing the Pet-Ag Trademarks by unauthorized Internet sellers, Pet-Ag actively monitors the sale of its products online.

94.     In the course of this monitoring, Pet-Ag discovered a high volume of products bearing the Pet-Ag Trademarks being illegally sold by Defendants on Amazon under the Luving Pets Storefront.

95.     After Pet-Ag discovered products bearing the Pet-Ag Registered Trademarks being illegally sold on the Luving Pets Storefront, Pet-Ag investigated the storefront to determine who was operating the storefront.

96.     After conducting an investigation, Pet-Ag identified Defendants as the owners and operators of the Luving Pets storefront.

97.     On or about November 5, 2021, counsel for Pet-Ag sent Defendants a cease-and-desist letter, demanding that they immediately cease selling products bearing the Pet-Ag Registered Trademarks.

98.     This letter further notified Defendants that they were injuring Pet-Ag in Illinois through their illegal actions and that they would be subject to personal jurisdiction in Illinois if they continued to engage in their conduct.

99.     This letter also notified Defendants that Pet-Ag has contracts with its Authorized Sellers that prohibit Authorized Sellers from selling Pet-Ag products to unauthorized resellers, and that Defendants will be liable for tortiously interfering with those contracts if they continue to purchase products bearing Pet-Ag's Trademarks from Authorized Sellers for the purpose of reselling them.

24

100.     Defendants did not respond to this letter and continued to sell products bearing the Pet-Ag Registered Trademarks on the Luving Pets Storefront.

101.     Counsel for Pet-Ag sent Defendants a second cease-and-desist letter on or about January 19, 2022.

102.     Defendants did not respond to this second cease-and-desist letter.

103.     Defendants' disregard of Pet-Ag's cease-and-desist letters and continued sale of non-genuine products despite being informed of their unlawful conduct demonstrates that they are acting intentionally, willfully, and maliciously.

**Defendants Are Not Subject To, Do Not Abide By, and Interfere With, Pet-Ag's Quality Control Requirements**

104.     Defendants are not Authorized Sellers of Pet-Ag products and are not subject to, and do not comply with, the Pet-Ag Terms.

105.     Defendants also do not comply with Pet-Ag's quality controls—and interfere with Pet-Ag's quality controls—because they have not given Pet-Ag the right to audit and inspect Defendants' facilities and practices. Therefore, among other things, Pet-Ag cannot know if Defendants are: (i) sourcing products only from authorized sources; (ii) properly inspecting and storing products, and not selling poor quality products; (iii) selling products only in official and unaltered Pet-Ag packaging; (iv) refusing to allow products that have been returned or repackaged to be listed as "new" products; (v) not permitting their products to be commingled with products owned by other sellers, such that a customer could receive a product owned by another seller when purchasing from Defendants; and (vi) providing exceptional customer service and responding appropriately to feedback received from customers.

106.     Defendants' failure to abide by the Pet-Ag Terms prevents Pet-Ag from exercising control over the quality of products Defendants sell bearing the Pet-Ag Trademarks. Unlike with

its Authorized Online Sellers, Pet-Ag cannot monitor or audit Defendants to ensure they are complying with its quality controls or take any action to correct quality problems it discovers or is alerted to in products sold by Defendants.

107. Because the products Defendants sell bearing the Pet-Ag Trademarks are not subject to, do not abide by, and interfere with Pet-Ag's quality control and customer service requirements, they are not genuine Pet-Ag products.

### Defendants Are Infringing the Pet-Ag Trademarks by Selling Products Bearing the Pet-Ag Trademarks That Do Not Come With the Pet-Ag Satisfaction Guarantee

108. As set forth above, genuine Pet-Ag products purchased from an Authorized Seller come with the Pet-Ag Satisfaction Guarantee because they comply with Pet-Ag's quality controls, and this Pet-Ag Satisfaction Guarantee is a material part of what consumers expect when they purchase Pet-Ag products.

109. Because Defendants are not Authorized Sellers of Pet-Ag products and do not comply with Pet-Ag's quality controls, the products they sell bearing the Pet-Ag Registered Trademarks do not come with the Pet-Ag Satisfaction Guarantee.

110. Because the products Defendants sell do not come with the Pet-Ag Satisfaction Guarantee, they are materially different from genuine Pet-Ag products.

111. Defendants' unauthorized sale of non-genuine products bearing the Pet-Ag Registered Trademarks but without the Pet-Ag Satisfaction Guarantee is likely to, and does, create customer confusion because customers who buy products from Defendants believe they are buying genuine Pet-Ag Products that come with the Pet-Ag Satisfaction Guarantee when they are not.

### Defendants Tortiously Interfere With Pet-Ag's Agreements With Its Authorized Sellers

112. Upon information and belief, Defendants have purchased Pet-Ag products from Pet-Ag Authorized Sellers for purposes of unlawfully infringing upon and materially damaging

26

the value of the Pet-Ag Trademarks by reselling the products on the Internet outside of Pet-Ag's quality controls.

113.    Pet-Ag's agreements with its Authorized Sellers prohibit Authorized Sellers from selling Pet-Ag products to third parties, like Defendants, who are not Authorized Sellers and who intend to resell the products.

114.    Defendants have known of this prohibition since, at the latest, November 5, 2021. On that date, Pet-Ag mailed a cease-and-desist letter to Defendants explaining that Pet-Ag has agreements with all of its Authorized Sellers that prohibit them from selling Pet-Ag products to any person or entity that is not an Authorized Seller but intends to resell the products.

115.    Pet-Ag's letter also informed Defendants that, by purchasing Pet-Ag products from an Authorized Seller for the purpose of reselling them, they were causing a breach of the agreement between Pet-Ag and its Authorized Seller and were interfering with Pet-Ag's agreements and business relationships.

116.    Pet-Ag's November 5, 2021 letter also advised Defendants that if they continued to acquire products from Pet-Ag's Authorized Sellers and then resold the products, they would be liable for tortiously interfering with Pet-Ag's contracts and business relationships with its Authorized Sellers.

117.    Despite being provided this information, upon information and belief, Defendants have continued to acquire and then resell Pet-Ag products from Pet-Ag's Authorized Sellers.

118.    Upon information and belief, Defendants do not disclose to Authorized Sellers that they intend to resell the products they purchase from Authorized Sellers.

119.    Upon information and belief, Defendants willfully and knowingly induced, and are continuing to induce, unknown Authorized Sellers to breach their agreements with Pet-Ag so that

27

they can acquire Pet-Ag products and unlawfully infringe upon the Pet-Ag Trademarks by reselling the products.

**Infringing Products Bearing the Pet-Ag Trademarks That Defendants Are Selling Are Being Stored All Around the United States, Including in Illinois**

120.    Individuals and entities who wish to sell products through storefronts on Amazon must enter into a contract with Amazon.com Services LLC ("Amazon.com").

121.    Once a seller has entered into a contract with Amazon.com, the seller must choose whether it will: (i) itself store and ship products; or instead (ii) pay ongoing fees to have Amazon.com store the seller's products at "fulfillment centers" (*i.e.*, warehouses) operated by Amazon.com, and ship products to consumers once they have been purchased. Amazon offers the second method of storage and fulfillment through a service called "Fulfillment By Amazon."

122.    When a seller chooses to use the "Fulfillment By Amazon" service, it retains ownership of the products it stores at Amazon fulfillment centers and can have Amazon.com ship products back to the seller before they have been purchased by customers.

123.    However, sellers who use the "Fulfillment By Amazon" are not able to control where Amazon.com stores sellers' products. Sellers who use the "Fulfillment By Amazon" service must agree to "Fulfillment by Amazon Service Terms" set forth in their contract with Amazon.com. These terms provide that Amazon can transfer sellers' products between fulfillment centers without notice or approval from sellers, although sellers are able to see—through their electronic Amazon accounts—where their products are currently being stored at any time.

124.    Amazon.com has more than 180 fulfillment centers spread around the United States, including at least one fulfillment center in almost every state. Amazon also promises to customers that all product orders it fulfills—including products that third-party sellers sell to customers while using the "Fulfillment By Amazon" service—will be delivered within two days

28

of purchase. To live up to this promise, Amazon carefully distributes all products it stores for third-party sellers between its fulfillment centers all around the country to ensure products can be delivered within two days of purchase no matter where in the United States they are ordered from.

125. As a result, sellers who use Amazon.com's "Fulfillment By Amazon" service have their products stored all around the country by Amazon.com, including in Illinois, where there are at least eleven Amazon fulfillment centers. *See Amazon to Build 2 Fulfillment Centers in Chicago's South Suburbs*, NBC Chicago, June 22, 2020, https://www.nbcchicago.com/news/local/amazon-to-build-2-fulfillment-centers-in-chicagos-south-suburbs/2293559/.

126. Defendants are using Amazon.com's Fulfillment By Amazon" service for many of the infringing products bearing the Pet-Ag Trademarks they are selling through their Luving Pets Storefront, as shown below (with highlighting):




127. Based on these facts, along with the fact that Illinois is a highly populous state, it is exceedingly likely that large quantities of products bearing the Pet-Ag Trademarks owned by

Defendants are being stored within Illinois by Amazon.com before the products are purchased by residents of Illinois.

128. Defendants are intentionally using Amazon.com's vast, established infrastructure to sell and ship infringing products bearing the Pet-Ag Trademarks to consumers nationwide, including customers located in Illinois, and is paying Amazon for the privilege to do so through commissions and fees. Defendants have not taken any steps to prevent residents of Illinois from purchasing products bearing the Pet-Ag Trademarks from Defendants' Amazon storefront.

**Pet-Ag Has Suffered Substantial Harm as a Result of Defendants' Conduct**

129. As set forth above, the unauthorized sale of products bearing the Pet-Ag Registered Trademarks through unauthorized sellers such as Defendants has caused significant harm to the Pet-Ag brand.

130. When a consumer receives a non-genuine, damaged, or poor-quality product from an unauthorized seller, such as Defendants, the consumer associates that negative experience with Pet-Ag. As such, Defendants' ongoing sale of non-genuine products bearing the Pet-Ag Registered Trademarks harms the Pet-Ag brand.

131. Pet-Ag has suffered, and will continue to suffer, significant monetary harm as a result of Defendants' actions including, but not limited to, loss of sales, damage to its intellectual property, and damage to its existing and potential business relations.

132. Pet-Ag has suffered, and will continue to suffer, irreparable harm as a result of Defendants' actions, including, but not limited to, irreparable harm to its reputation, goodwill, business and customer relationships, intellectual property rights, and brand integrity.

133. Pet-Ag is entitled to injunctive relief because, unless enjoined by this Court, Defendants will continue to unlawfully sell non-genuine products bearing the Pet-Ag Registered

Trademarks, causing continued irreparable harm to Pet-Ag's reputation, goodwill, relationships, intellectual property, and brand integrity.

134.    Furthermore, Defendants' conduct was and is knowing, reckless, intentional, willful, malicious, wanton, and contrary to law.

135.    Defendants' disregard of communications from Pet-Ag and continuation of selling of non-genuine products despite being informed of their unlawful conduct demonstrates that they are acting intentionally, willfully, and maliciously.

136.    Defendants' willful violations of the Pet-Ag Registered Trademarks and continued pattern of misconduct demonstrate intent to harm Pet-Ag.

**FIRST CAUSE OF ACTION**
**Trademark Infringement**
**15 U.S.C. §§ 1114 and 1125(a)(1)(A)**

137.    Pet-Ag hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

138.    Pet-Ag is the owner of the Pet-Ag Registered Trademarks.

139.    Pet-Ag has registered the Pet-Ag Registered Trademarks with the United States Patent and Trademark Office.

140.    The Pet-Ag Registered Trademarks are valid and subsisting trademarks in full force and effect.

141.    Defendants willfully and knowingly used, and continue to use, the Pet-Ag Registered Trademarks in commerce for purposes of selling non-genuine products bearing the Pet-Ag Registered Trademarks on the Internet without Pet-Ag's consent.

142.    The products Defendants sell bearing the Pet-Ag Registered Trademarks are not authorized for sale by Pet-Ag.

31

143. The products Defendants sell bearing the Pet-Ag Registered Trademarks are materially different from genuine Pet-Ag products because they are not subject to, do not abide by, and interfere with the legitimate and substantial quality controls that Pet-Ag has established.

144. The products Defendants sell bearing the Pet-Ag Registered Trademarks are materially different from genuine Pet-Ag products because they do not come with the Pet-Ag Satisfaction Guarantee, which accompanies genuine Pet-Ag products.

145. Defendants' unauthorized sale of materially different products bearing the Pet-Ag Registered Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests the products Defendants offer for sale are genuine Pet-Ag products when they are not.

146. Defendants' unauthorized sale of materially different products bearing the Pet-Ag Registered Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with Pet-Ag when, in fact, they are not.

147. Defendants' unauthorized use of the Pet-Ag Registered Trademarks has infringed upon and materially damaged the value of the Pet-Ag Registered Trademarks, and caused significant damage to Pet-Ag's business relationships.

148. As a proximate result of Defendants' actions, Pet-Ag has suffered, and will continue to suffer immediate and irreparable harm. Pet-Ag has also suffered, and continues to suffer, damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

149. Pet-Ag is entitled to recover its damages caused by Defendants' infringement of the Pet-Ag Registered Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

150.     Pet-Ag is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and unless Defendants are permanently enjoined, Pet-Ag will suffer irreparable harm.

151.     Pet-Ag is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Pet-Ag Registered Trademarks.

## SECOND CAUSE OF ACTION
### Unfair Competition
### 15 U.S.C. § 1125(a)

152.     Pet-Ag hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

153.     As set forth above, Defendants are selling non-genuine products bearing the Pet-Ag Registered Trademarks that are materially different from genuine Pet-Ag products.

154.     Defendants' sale of non-genuine products bearing the Pet-Ag Registered Trademarks is likely to cause consumer confusion and lead consumers to believe that those products are affiliated with, connected with, associated with, sponsored by, or approved by Pet-Ag when they are not.

155.     Defendants' conduct constitutes unfair competition under the Lanham Act, 15 U.S.C. § 1125(a).

156.     Pet-Ag is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and unless Defendants are permanently enjoined, Pet-Ag will suffer irreparable harm.

157.    Pet-Ag is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Pet-Ag Registered Trademarks.

**THIRD CAUSE OF ACTION**
**Violation of the Illinois Uniform Deceptive Trade Practices Act**
**815 ILCS 510/2**

158.    Pet-Ag hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

159.    Pet-Ag is the owner of the Pet-Ag Registered Trademarks.

160.    Pet-Ag has registered the Pet-Ag Registered Trademarks with the United States Patent and Trademark Office.

161.    The Pet-Ag Registered Trademarks are valid and subsisting trademarks in full force and effect.

162.    Defendants willfully and knowingly used, and continue to use, the Pet-Ag Trademarks in interstate commerce, including through their product listings on Amazon, for the purpose of advertising, promoting, and selling products bearing the Pet-Ag Trademarks without Pet-Ag's consent.

163.    Defendants' advertisements and promotions of products unlawfully using the Pet-Ag Trademarks have been disseminated to the relevant purchasing public.

164.    Defendants use the Pet-Ag Trademarks with the intent that consumers will rely on their use of the Pet-Ag Trademarks and believe that they are selling genuine Pet-Ag Products.

165.    Pet-Ag has not authorized Defendants to advertise, promote, or sell products bearing the Pet-Ag Trademarks, and Pet-Ag does not know the source of the products Defendants are/have been selling.

166.    The products Defendants advertise, promote, and sell bearing the Pet-Ag Trademarks are not covered by the Pet-Ag Satisfaction Guarantee.

167.    Pet-Ag has established substantial quality control procedures that genuine Pet-Ag Products must comply with.

168.    Pet-Ag abides by these quality control procedures and requires all Authorized Sellers to abide by them as well.  Pet-Ag's quality controls are legitimate and material, as they protect consumers from receiving poor-quality products that could harm them. When a consumer considers whether to purchase a product bearing the Pet-Ag Trademarks, the applicability of Pet-Ag' quality controls to the product is relevant and material to the consumers' purchasing decision.

169.    The products Defendants advertise, promote, and sell bearing the Pet-Ag Trademarks are not subject to, do not abide by, and interfere with Pet-Ag's quality controls and customer service requirements.

170.    Because the products Defendants advertise, promote, and sell bearing the Pet-Ag Trademarks are not covered by the Pet-Ag Satisfaction Guarantee, and are not subject to, do not abide by, and interfere with Pet-Ag's quality controls and customer service requirements, the products Defendants sell are materially different from genuine Pet-Ag Products sold by Authorized Sellers.

171.    Because the products Defendants advertise, promote, and sell bearing the Pet-Ag Trademarks are materially different from Pet-Ag Products sold by Authorized Sellers, the products Defendants sell are not genuine Pet-Ag Products.

172.    Defendants' unauthorized advertisement, promotion, and sale of products bearing the Pet-Ag Trademarks interfere with Pet-Ag's quality controls and ability to exercise quality control over products bearing the Pet-Ag Trademarks.

173.    Defendants' unauthorized advertisement, promotion, and sale of products bearing the Pet-Ag Trademarks are likely to cause confusion, cause mistake, and/or deceive consumers because Defendants' use of the Pet-Ag Trademarks suggests that the products Defendants offer for sale are subject to and compliant with Pet-Ag's quality controls when, in fact, they do not and are not.    Defendants' unauthorized advertisement, promotion, and sale of products bearing the Pet-Ag Trademarks are likely to cause confusion, cause mistake, or deceive consumers because Defendants' use of the Pet-Ag Trademarks suggests that the products Defendants offer for sale are genuine Pet-Ag Products when, in fact, they are not.

174.    Defendants' unauthorized advertisement, promotion, and sale of products bearing the Pet-Ag Trademarks are likely to cause confusion or misunderstanding among consumers because Defendants' use of the Pet-Ag Trademarks suggests that the products Defendants offer for sale are sourced from, sponsored by, approved by, or certified by Pet-Ag when, in fact, they are not.

175.    Defendants' unauthorized advertisement, promotion, and sale of products bearing the Pet-Ag Trademarks are likely to cause confusion or misunderstanding among consumers because Defendants' use of the Pet-Ag Trademarks suggests that the products Defendants offer for sale are affiliated with, connected with, associated with, or certified by Pet-Ag when, in fact, they are not.

176.    Defendants' unauthorized and deceptive use of the Pet-Ag Trademarks is material and likely to influence customers to purchase the products Defendants sell, as consumers are likely to believe that products Defendants advertise using the Pet-Ag Trademarks are genuine Pet-Ag Products that are subject to, and abide by, Pet-Ag's quality-control requirements and come with benefits associated with genuine Pet-Ag Products when, in fact, they do not.

36

177. Defendants' unauthorized use of the Pet-Ag Trademarks in advertising and otherwise infringes the Pet-Ag Trademarks.

178. Defendants' use of the Pet-Ag Trademarks in connection with the unauthorized advertising, promotion, and sale of products bearing the Pet-Ag Trademarks is a deceptive trade practice under 815 ILCS 510/2. As a result of Defendants' conduct, Pet-Ag has suffered, and continues to suffer, immediate, and irreparable harm. This immediate and irreparable harm includes damage to brand goodwill when consumers receive poor-quality products and post negative reviews that will remain on Amazon permanently, harming Pet-Ag's reputation among consumers and placement in online search results.

179. Pet-Ag has also suffered, and continues to suffer, damages including, but not limited to, loss of business, diminished goodwill, reputational harm, and decreased profits in an amount to be proven at trial.

180. Pursuant to 815 ILCS 510/3, Pet-Ag is entitled to an injunction enjoining Defendants' unlawful conduct, and an award of attorneys' fees and costs.

## FOURTH CAUSE OF ACTION
### Common Law Trademark Infringement

181. Pet-Ag hereby incorporates the allegations contained in the foregoing paragraphs as if fully set forth herein.

182. Pet-Ag is the owner of the Pet-Ag Trademarks.

183. Pet-Ag has registered the Pet-Ag Trademarks with the United States Patent and Trademark Office.

184. The Pet-Ag Trademarks are valid and subsisting trademarks in full force and effect.

185.    The Pet-Ag Trademarks are distinctive and widely recognized by the consuming public. Pet-Ag Products are sold and purchased through its Authorized Sellers throughout the United States, including Illinois.

186.    Pet-Ag is widely recognized as the designated source of goods bearing the Pet-Ag Trademarks.

187.    Defendants willfully and knowingly used, and continue to use, the Pet-Ag Trademarks in interstate commerce for purposes of selling on the Internet without Pet-Ag's consent products bearing the Pet-Ag Trademarks.

188.    The products Defendants sell bearing the Pet-Ag Trademarks are not authorized for sale by Pet-Ag.

189.    Pet-Ag has established legitimate, substantial, and non-pretextual quality control procedures over Pet-Ag Products.

190.    Pet-Ag abides by these quality control procedures and requires all of its Authorized Sellers to abide by these quality controls.

191.    Pet-Ag's quality controls are material, as they protect consumers from receiving poor quality products that could harm them.  When a consumer is deciding whether to purchase a product bearing the Pet-Ag Trademarks, a consideration material to the purchasing decision is whether the product is subject to and abides by Pet-Ag's quality controls.  The products Defendants sell bearing the Pet-Ag Trademarks are not subject to, do not abide by, and interfere with Pet-Ag's quality controls and customer service requirements.

192.    The products Defendants sell bearing the Pet-Ag Trademarks are not covered by the Pet-Ag Satisfaction Guarantee.

193.   Because the products Defendants sell bearing the Pet-Ag Trademarks are not subject to, do not abide by, and interfere with Pet-Ag's quality controls and customer service requirements and are not covered by the Pet-Ag Satisfaction Guarantee, the products Defendants sell are materially different from genuine Pet-Ag Products.

194.   Because the products Defendants sell bearing the Pet-Ag Trademarks are not subject to, do not abide by, and interfere with Pet-Ag's quality controls and customer service requirements and are not covered by the Pet-Ag Satisfaction Guarantee, the products Defendants sell are not genuine Pet-Ag Products.

195.   Defendants' unauthorized sale of products bearing the Pet-Ag Trademarks interferes with Pet-Ag's ability to exercise quality control over products bearing the Pet-Ag Trademarks.

196.   The products Defendants sell are materially different from genuine Pet-Ag Products because they are not covered by the Pet-Ag Satisfaction Guarantee.

197.   Defendants' unauthorized sale of products bearing the Pet-Ag Trademarks is likely to cause confusion, cause mistake, and/or deceive consumers because it suggests that the products Defendants offer for sale are subject to, and abide by, Pet-Ag's quality control program when, in fact, they do not. Defendants' unauthorized sale of products bearing the Pet-Ag Trademarks is likely to cause confusion, cause mistake, and/or deceive consumers because it suggests that the products Defendants offer for sale are genuine Pet-Ag Products when, in fact, they are not.

198.   Defendants' unauthorized sale of products bearing the Pet-Ag Trademarks is likely to cause confusion, cause mistake, and/or deceive consumers because it suggests that the products Defendants offer for sale are sponsored by, authorized by, or otherwise connected with Pet-Ag when, in fact, they are not.

39

199. Defendants' knowing and willful use of the Pet-Ag Trademarks in connection with the unauthorized and illegal sale of products bearing the Pet-Ag Trademarks without Pet-Ag's consent infringes the Pet-Ag Trademarks and is contrary to honest practice in industrial and commercial matters.

200. Defendants' unlawful actions and unauthorized use of the Pet-Ag Trademarks has materially damaged the value of the Pet-Ag Trademarks, caused significant damage to Pet-Ag's business relations, and infringed the Pet-Ag Trademarks.

201. As a proximate result of Defendants' actions, Pet-Ag has suffered, and will continue to suffer, irreparable harm, as well as damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

202. Pet-Ag is entitled to recover exemplary damages because Defendants have acted with fraud, malice, and their conduct was willful and wanton.

### FIFTH CAUSE OF ACTION
**Tortious Interference with Contractual Relations**

203. Pet-Ag hereby incorporates the allegations contained in the foregoing Paragraphs as if fully set forth herein.

204. Pet-Ag Products are sold exclusively through Pet-Ag's website and its network of Authorized Sellers.

205. Pet-Ag has entered into valid and enforceable agreements with its Authorized Sellers to sell Pet-Ag Products. These agreements specifically prohibit Authorized Sellers from selling Pet-Ag Products to unauthorized resellers such as Defendants.

206. Defendants are not Authorized Sellers of Pet-Ag Products.

207. Defendants have sold—and continue to sell—a number of products bearing the Pet-Ag Trademarks through their Luving Pets Storefront.

40

208.     Pet-Ag has not itself sold any Pet-Ag Products to Defendants.

209.     Defendants know that Pet-Ag's agreements with its Authorized Sellers prohibit Authorized Sellers from selling Pet-Ag Products to anyone who is not an Authorized Reseller and intends to resell the products, as is the case with Defendants.

210.     Defendants had notice of this prohibition, at least as early as on or around November 5, 2021, through a cease-and-desist letter sent by Pet-Ag.

211.     Thus, Defendants were aware of Pet-Ag's agreements with its Authorized Sellers.

212.     After being notified of this prohibition, Defendants intentionally induced one or more of Pet-Ag's Authorized Sellers to breach their agreements with Pet-Ag by continuing to acquire products from Pet-Ag' Authorized Sellers for the purpose of selling them on the Internet.

213.     Despite their knowledge of this prohibition, Defendants intentionally, unjustifiably, knowingly, and willfully interfered with Pet-Ag's agreements with its Authorized Sellers by inducing the Authorized Sellers to breach their agreements and sell products to Defendants so they could unlawfully resell them on the Internet.

214.     Defendants acted with a wrongful purpose and employed wrongful means by acquiring Pet-Ag Products for the purpose of reselling those products on the Internet in violation of Pet-Ag's agreements with its Authorized Sellers.  Specifically, Defendants induced Authorized Sellers to breach their agreements with Pet-Ag so that Defendants could unlawfully infringe upon and materially damage the value of the Pet-Ag Trademarks by reselling the products they obtained from Authorized Sellers on the Internet.

215.     Because Defendants have refused to disclose how they obtained the products bearing the Pet-Ag Trademarks they have resold, Pet-Ag must take discovery in this action to learn the specific identities of the Authorized Sellers that sold products to Defendants.  Pet-Ag's agreements

41

with its Authorized Sellers are a specific class of contract that Defendants caused Authorized Sellers to breach when they purchased products from Authorized Sellers for resale.

216.    Defendants' actions have caused injury to Pet-Ag for which Pet-Ag is entitled to compensatory damages in an amount to be proven at trial.

217.    The injury to Pet-Ag is immediate and irreparable, as Pet-Ag's reputation and relationships have been damaged among its consumers and Authorized Sellers.

218.    Pet-Ag is also entitled to punitive damages because Defendants acted with actual malice accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by their acts and omissions.

## PRAYER FOR RELIEF

WHEREFORE, Pet-Ag prays for relief and judgment as follows:

A.    Judgment in favor of Pet-Ag and against Defendants in an amount to be determined at trial including, but not limited to, compensatory damages, statutory damages, treble damages, liquidated damages, punitive damages, restitution, including disgorgement of profits, and pre-judgment and post-judgment interest, as permitted by law;

B.    Preliminary and permanent injunctions enjoining Defendants and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, any and all other entities owned or controlled by Defendants, and all of those in active concert and participation with Defendants (the "Enjoined Parties") as follows:

        i)    Prohibiting the Enjoined Parties from advertising or selling, via the Internet or otherwise, all products bearing the Pet-Ag Registered Trademarks;

       ii)    Prohibiting the Enjoined Parties from using any of the Pet-Ag Registered Trademarks in any manner, including advertising on the Internet;

iii)     Prohibiting the Enjoined Parties from importing, exporting, manufacturing, producing, distributing, circulating, selling, offering to sell, advertising, promoting, or displaying any and all products bearing any of the Pet-Ag Registered Trademarks;

iv)     Prohibiting the Enjoined Parties from disposing of, destroying, altering, moving, removing, concealing, or tampering with any records related to any products sold by them which contain the Pet-Ag Registered Trademarks including invoices, correspondence with vendors and distributors, bank records, account books, financial statements, purchase contracts, sales receipts, and any other records that would reflect the source of the products that Defendants have sold bearing these trademarks;

v)      Requiring the Enjoined Parties to take all action to remove from the Enjoined Parties' websites any reference to any of Pet-Ag's products, or any of the Pet-Ag Registered Trademarks;

vi)     Requiring the Enjoined Parties to take all action, including but not limited to, requesting removal from the Internet search engines (such as Google, Yahoo, and Bing), to remove from the Internet any of the Pet-Ag Registered Trademarks which associate Pet-Ag's products or the Pet-Ag Registered Trademarks with the Enjoined Parties or the Enjoined Parties' websites; and

vii)    Requiring the Enjoined Parties to take all action to remove the Pet-Ag Registered Trademarks from the Internet, including from the website www.amazon.com.

43

viii)     Requiring the Enjoined Parties to destroy or return to Pet-Ag all products bearing the Pet-Ag Trademarks in their possession, custody, or control.

C.     An award of attorneys' fees, costs, and expenses.

D.     Such other and further relief as the Court deems just, equitable and proper.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Pet-Ag demands a trial by jury on all issues so triable.

Dated: February 7, 2022            Respectfully submitted,

**PET-AG, INC.**

By: /s/ Andrew D. LeMar
One of its attorneys

Andrew D. LeMar
alemar@burkelaw.com
Burke, Warren, MacKay & Serritella, P.C.
330 North Wabash Avenue, 21st Floor
Chicago, IL 60611
Telephone: (312) 840-7000
Facsimile: (312) 840-7900

Martha Brewer Motley (*pro hac vice* forthcoming)
Vorys, Sater, Seymour and Pease LLP
mbmotley@vorys.com
52 East Gay Street
Columbus, OH 43215
Telephone: (614) 464-6400
Facsimile: (614) 719-5080

44